

U.S. Department of Justice

United States Attorney
Eastern District of New York

AL:EAG

271 Cadman Plaza East
Brooklyn, New York 11201

October 2, 2015

By ECF

The Honorable Frederic Block
United States District Judge
United States District Court
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    Russo v. United States of America
              Civil Docket No. 15-0048 (FB)

Dear Judge Block:

      The government respectfully submits this letter in response to petitioner Anthony "Chucky" Russo's motion pursuant to Rule 60(b) of the Federal Rules of Civil Procedure.[1]  (Ltr. of Alan S. Futerfas to United States District Court, dated Sept. 23, 2014. ("Rule 60(b) Mot."))  Although Chucky Russo does not expressly state, the government assumes that Chucky Russo is seeking reconsideration of a district court's prior denial of his motion for habeas relief, pursuant to 28 U.S.C. § 2255, regarding his convictions on Counts One and Two (racketeering and racketeering conspiracy, including the murders of John Minerva and Michael Imbergamo as predicate racketeering acts), Count Five (the murder of John Minerva in aid of racketeering) and Count Six (the murder of Michael Imbergamo in aid of racketeering).  Order of Hon. Charles P. Sifton in CV 03-2444 (Docket No. 16) and CR 92-351 (Docket No. 1742), dated Nov. 24, 2004 ("Nov. 24, 2004 Habeas Order").  For the reasons set forth below, the government respectfully submits that: (1) transfer of this case is appropriate to the Honorable Brian M. Cogan who has presided over three cases in which other defendants were charged with their knowledge of and participation in the Minerva and Imbergamo murders; and (2) Chucky Russo's motion is without merit and should be summarily denied.

---

      [1]      In light of the numerous individuals named Russos that are relevant to petitioner's motion, petitioner will be referred to as "Chucky Russo" or the "petitioner" in this letter.

BACKGROUND

On or about May 4, 1993, petitioner Chucky Russo was arraigned on a superseding indictment charging him with racketeering and racketeering conspiracy in violation of 18 U.S.C. §§ 1962(c) and (d); murder and conspiracy to commit murder in furtherance of racketeering in violation of 18 U.S.C. § 1959; conspiracy to make extortionate extensions and collections of credit in violation of 18 U.S.C. §§ 892 and 894; and using and carrying firearms in furthering these crimes in violation of 18 U.S.C. § 924(c).

That case arose from the deadly internal war within the Colombo Organized Crime Family of La Cosa Nostra (the "Colombo Family") that began in 1991, when the Colombo Family split into two opposing factions—one loyal to the incarcerated "official" boss of the family, Carmine Persico, Jr., and the other loyal to the appointed acting boss, Victor J. Orena. The murders of John Minerva and Michael Imbergamo, who were both killed on March 25, 1992, in connection with the internecine conflict, were alleged as predicate racketeering acts as part of the racketeering and racketeering conspiracy counts and as the basis for the murder in-aid-of racketeering counts. Following trial, Chucky Russo was convicted of each of these crimes.

I.      Evidence Elicited at Chucky Russo's 1994 Trial

The Second Circuit has previously laid out the relevant facts established at trial supporting Chucky Russo's participation in these murders:

> The government's evidence at trial came primarily in the form of testimony from four accomplice witnesses—Lawrence Mazza, Carmine Sessa, Joseph Ambrosino (all members of the Persico faction), and Salvatore Miciotta (a member of the Orena faction)—and revealed the following:
>
> Joseph and [Chucky] Russo were captains in the Colombo Family, and in 1992, after the intra-family war commenced, Joseph Russo was named acting underboss within the Persico faction; Monteleone was a member of the Russos' crew. After an unsuccessful attempt by Persico loyalists to kill Victor Orena in June 1991 inflamed tensions within the Colombo Family, Sessa attended a meeting that included the Russos, Monteleone, and others, during which the Russos told Sessa that they would call in their men and tell them to prepare for war with the Orena faction. Miciotta, at the time a member of the Russos' crew, testified that he was called to a meeting by the Russos at which the Russos told him and other members of the crew about the intra-family war, and to ready themselves for it. Following the meeting, Monteleone told Miciotta "that this was an opportunity for all of us to elevate our stature in the family."

A truce organized by representatives of the other organized crime families of La Cosa Nostra broke down in November 1991 when members of the Orena faction attempted to kill Gregory Scarpa, Sr., a soldier in the Persico faction. Mazza testified that immediately after the attempted murder of Scarpa he went with Scarpa to see [Chucky] Russo, and after being informed of the attempt on Scarpa's life, [Chucky] Russo said that he would contact Sessa, Joseph Russo and others to let them know that "the shooting started." A meeting was then held at Joseph Russo's grandmother's house in Brooklyn, at which the Persico captains decided to retaliate. Ambrosino testified that [Chucky] Russo assured him that they were ready to attack the Orena side. He also testified that, sometime after this meeting, Joseph Russo and Theodore Persico told him [Ambrosino] that they, [Chucky] Russo, and others had attempted to kill Benny Aloi, an Orena captain, but had "just missed." According to Mazza and Sessa, Monteleone participated in a murder attempt on a different member of the Orena faction, Louis Malpeso, which was also unsuccessful.

During the early months of 1992, the Russos attended several meetings of Persico faction members to monitor the progress of the war. Sessa and Scarpa repeatedly complained that Scarpa and his crew were the only ones who had actually succeeded in killing any Orena faction members, and that they were unfairly shouldering the burden for all the others. The Russos provided assurances that their associates "were out every day looking for people," particularly those former members of the Russos' crew who had switched allegiances to the Orena side, including John Minerva.

On March 25, 1992, John Minerva was killed outside a cafe he owned on Long Island. Michael Imbergamo, who apparently had been providing security for Minerva following an earlier attempt on Minerva's life two weeks prior to his murder, was killed along with Minerva. Eyewitness testimony and telephone records placed Monteleone, in an agitated state, at a bar and a delicatessen less than two blocks away from Minerva's cafe shortly before Minerva's murder.

Soon after the Minerva/Imbergamo murders, the Russos and other members of the Persico faction, including Scarpa, met at Wolf's Delicatessen in Manhattan. Mazza testified that during this meeting, the Russos admitted their involvement in these

3

murders, bragging that "they had been working on getting [Minerva]" and "finally got to him in front of his cafe," and that they were particularly satisfied because Minerva had worked for Joseph Russo's father for many years before deciding to ally himself with Orena.

Unlike Mazza, Sessa testified that he first learned of the Russos' involvement in the murders not from the Russos themselves but from Scarpa. Soon after the murders, and after learning from Scarpa about the Russos' involvement, Sessa attended a meeting of Persico faction members (including Monteleone) at a New York diner. When he entered the meeting Sessa approached Joseph Russo and congratulated him for his "nice work," and Russo accepted the congratulations. Although Minerva's name was not mentioned, Sessa testified that he believed the reason for the congratulations—the killing of Minerva—was well understood by Russo. Sessa thereafter heard from another member of the Persico faction of the Colombo Family—either Joseph Tomasello or Theodore Persico—that Monteleone and another member of the Russos' crew, Tommy Gioeli, as well as a member of Theodore Persico's crew, had committed the Minerva/Imbergamo murders. Sessa, in turn, told Ambrosino that the Russos' crew was responsible for the murders.

The case presented by defendants-appellees consisted largely of efforts to discredit the accomplice witnesses, and to portray the cycle of violence that erupted in 1991 as purely a personal vendetta on the part of Scarpa, perpetrated with the aid of Sessa. Defendants-appellees claimed that there was no factional war within the Colombo Family, but merely a "Scarpa/Sessa war." They argued that the attempted murder of Scarpa could be explained by the fact that Scarpa was widely believed to be a government informant, and that, in turn, Scarpa had purely personal motives for murdering his victims—to prevent them from revealing that he was an informant and to retaliate against them for the attempt on Scarpa's life. More generally, defendants-appellees tried to portray Scarpa as "a loose cannon," and "argued to the jury that Scarpa was not a person to be trusted and was in fact an informant." Additionally, the Russos pointed to "the lack of hard evidence to link them to the Minerva and Imbergamo homicides," and challenged Mazza's testimony about the Russos' statements at the Wolf's Delicatessen meeting as uncorroborated and unreliable. Monteleone, whose initial line of defense appeared to be that he could not be placed near the murder scene at the relevant time,

4

>argued in summation that although he was in fact present near the scene shortly before the murders, he had actually been secretly visiting Minerva, with whom he had remained friends despite the war.

United States v. Orena, 145 F.3d 551, 554-55 (2d Cir. 1998) (citations omitted).

II.     Post-Conviction Motions for New Trial and Motion for Habeas Corpus

Following his conviction at trial, Chucky Russo has twice moved for new trials, both of which were ultimately denied. In the first motion, Chucky Russo alleged that the government violated its obligations, pursuant to Brady v. Maryland, 373 U.S. 83 (1963), by failing to disclose information that defendants could have used to impeach the credibility of out-of-court statements made by co-conspirator Gregory Scarpa, Sr., that were admitted at trial. Specifically, Chucky Russo argued that the government failed to disclose that Scarpa, Sr., was a government informant and misrepresented his participation in numerous murders. The district court initially granted Chucky Russo's motion, see United States v. Persico, No. 92-CR-0351, 1997 WL 867788 (E.D.N.Y. Mar. 13, 1997), but the circuit court reversed. United States v. Orena, 145 F.3d 551 (2d Cir. 1998). On or about March 12, 1999, Chucky Russo was sentenced to a term of life imprisonment. Judgment was entered on March 17, 1999.

Chucky Russo's second motion for a new trial was based on "new evidence" including the testimony of Special Agents of the Federal Bureau of Investigation ("FBI") concerning FBI Agent Lindley DeVecchio's relationship with Scarpa, Sr. and records from the Office of Professional Responsibility investigation regarding that relationship. According to the circuit court, the most notable documents obtained by Chucky Russo and his co-defendants were a report of the debriefing of Joseph Ambrosino on April 25, 1994, in which he "disclosed that he believed a New York Post article that had been the subject of testimony by Sessa during the trial was referring to the possibility that Greg Scarpa, Sr. was a government informant" and "that Scarpa's informant status was 'closed' and soon thereafter 'reopened' by the FBI in early 1992, around the time Scarpa implicated the defendants in the murders at issue here."[2] United States v. Monteleone, Sr., 257 F.3d 210 (2d Cir. 2001). The district court denied that motion.

---

[2]     "On February 27, 1992, DeVecchio was ordered to 'close' Scarpa as an informant. On that day, [Carmine] Imbriale (a member of the Persico faction) cooperated with law enforcement and reported Scarpa's involvement in the war and his plan to murder an Orena-faction member. The Minerva and Imbergamo murders occurred on March 25, 1992. On March 31, 1992, New York City police observed Scarpa throwing a loaded gun from a fleeing car, and Scarpa contacted DeVecchio to help him avoid arrest for gun possession. On that day, March 31, 1992, Scarpa told DeVecchio that 'the hit on John Minerva was handled by Jo-Jo and Chuckie Russo's people.'" United States . v. Monteleone, 257 F.3d 210, 217 (2d Cir. 2001).

On appeal to the Second Circuit in connection with his new trial motion, Russo argued that: "(1) there [wa]s newly discovered evidence that the cooperating witnesses Lawrence Mazza and Carmine Sessa perjured themselves at trial and that the government knew about the perjury; (2) the fact that Mazza and Sessa perjured themselves at trial . . . render[ed] the Scarpa non-disclosures material within the meaning of Kyles v. Whitley, 514 U.S. 419 (1995)[,] and Brady v. Maryland, 373 U.S. 83 (1963); (3) the district court erred in failing to instruct the jury that it had the power to determine whether Scarpa was in fact a co-conspirator under United States v. DeSapio, 435 F.2d 272, 282-83 (2d Cir. 1970) (Friendly, J.); (4) Scarpa's statements were erroneously admitted under Fed. R. Evid. 801(d)(2)(E), because Scarpa was a government informant and therefore, as a matter of law, not a member of the conspiracy; and (5) Bailey v. United States, 516 U.S. 137 (1995) requires [vacatur of ] their firearms convictions under 18 U.S.C. § 924(c) because the district court improperly charged the jury on 'use' of a weapon." United States . v. Monteleone, 257 F.3d 210, 218 (2d Cir. 2001). The circuit court affirmed their convictions in all respects. Id.

On May 4, 2003, Chucky Russo moved for habeas relief on the following grounds: (1) newly discovered "exculpatory" material; (2) an ex parte communication between a juror and the trial judge during trial; (3) a conflict of interest among prosecutors deprived him the opportunity to call witnesses at trial; (4) the prosecution's suppression of Brady material interfered with his counsel's ability to conduct plea negotiations; and (5) ineffective assistance of counsel. The newly discovered "exculpatory" material pertained to following information supplied by Gabriel Marquez, as set forth in the district court's denial of Chucky Russo's habeas motion:

> In October 1994 Gabriel Marquez ("Marquez") was arrested in connection with a conspiracy to distribute cocaine in Manhattan and Brooklyn. Marquez agreed to cooperate and was debriefed by AUSA Eric Burnstein and special agent Myron Holowchuk of the Drug Enforcement Agency ("DEA"). In the interview, Marquez told the agents that although not connected with La Cosa Nostra, he had dealings with Eric Curcio ("Curcio"). Curcio was known by law enforcement to be an associate in the Colombo family and Monteleone's nephew. Petitioners dispute whether Curcio is related to Monteleone and describe him as an associate in the Luchese Family who surrounded himself with those loyal to the Orena faction when associating with the Colombo family.
>
> During the interview with Agent Holowchuk and AUSA Burnstein, Marquez described an incident in which he drove Curcio and two other men, Anthony Calandra ("Calandra") [later identified as Anthony Colandra] and Robert Ventrig ("Ventrig") [later identified as Robert Ventriglia] to a location in Long Island where they began shooting at a nearby car until a

6

> surprised Marquez sped away from the scene. Marquez testified about this incident at the 1996 trial of his codefendant, Charlie Diaz, before Judge Korman. See United States v. Diaz, No. CR-95-1212. According to Marquez's testimony, he was introduced to Curcio in 1992 by Calandra. After the introduction, Marquez, Curcio, Calandra and Ventrig socialized together. Marquez testified that he was with them in Brooklyn one evening in early 1992 when he agreed to drive them to another location to look for women. Curcio directed Marquez to the Southern State Parkway where he drove for approximately 30 minutes before Curcio directed him to Exit 31. Petitioners allege that Exit 31, the Linden St./Massapequa Park exit, is the logical exit for Minerva's club. Marquez testified that after exiting the Southern State Parkway, Curcio instructed him to stop at a gas station so that Curcio could use the bathroom. After approximately ten minutes, Curcio returned to the car and resumed giving Marquez driving directions block by block. At some point, Curcio told Marquez to slow down as they approached a vehicle. When Marquez pulled up alongside the vehicle, Calandra, who was seated in the rear on the passenger side, started shooting out the window at a person in the other vehicle. Marquez, taken by surprise, sped away from the scene. Marquez testified that approximately one month later Calandra showed him newspaper articles about a murder and told Marquez that he and Curcio had succeeded in killing the target they attempted to kill the night Marquez was driving them.
>
> Approximately two years later, Calandra expressed regret to Marquez for having committed the murders and told him that Curcio had never paid him for what he did. Although Marquez did not know the names of the victims, government agents theorized that the murders Calandra described to Marquez were of Minerva and Imbergamo. The agents also theorized that the incident in which Marquez was driving was the attempt on Minerva's life that occurred approximately two weeks before he was murdered. The government asserts that it was never positively concluded that Marquez was describing the Minerva and Imbergamo murders of March 25, 1992.

Nov. 24, 2004 Habeas Order at 15-18. The district court denied the habeas motion on all grounds.

7

III.     Instant Motion

The primary basis for Chucky Russo's current motion, brought pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, is his assertion that he is factually innocent of participating in the Minerva and Imbergamo murders. In support of this claim, he submits an affidavit of Colombo Family associate Frank Sparaco, a consensual recording of now deceased Colombo Family consigliere Richard Fusco and evidence elicited at the trial of Colombo Family member (and acting boss) Thomas Gioeli, including testimony by former Colombo Family captain Dino Calabro. As an initial matter and as set forth more fully below, Chucky Russo's motion is a second or "successive" habeas petition which requires permission of the Court of Appeals to proceed. In any event, as detailed below, none of these items, either considered individually or collectively, establishes Chucky Russo's innocence and accordingly, his motion should be denied.

   A.     Trial Evidence in *United States v. Gioeli*

At the Gioeli trial, the government introduced evidence establishing that Thomas Gioeli, who in 1992 was a soldier in the Colombo family and reported to Joseph Russo, participated in the Minerva and Imgerbamo murders, as detailed below.

Dino Calabro testified that Minerva was targeted because Minerva had defected from Joseph Russo's crew to the Orena faction. (T 1025).[3] On multiple occasions, Gioeli and Calabro drove to Minerva's club on North Broadway in Massapequa, New York and to Minerva's residence a few blocks away intending to kill Minerva; however, they were not successful. (T 1027-28).

On the evening of March 25, 1992, Minerva and Michael Imbergamo were shot to death inside of a car parked in front of the Broadway Café at 1129C North Broadway in North Massapequa, New York. (T 2655-56, 2673, 2779-80; GX 209(a), 209(b), 211(a), 211(c)). Shortly before the murders, at approximately 8:00 p.m., two men working at a strip mall at the intersection of North Broadway and Boundary Avenue (approximately a block away from where the men were murdered) saw three men in search of a telephone, one of whom was later identified as Monteleone. (T 1917-19, 2747-48, 2753-54, 2767-69; GX 374). Telephone records revealed that the three men placed telephone calls to the residences of Patricia Ranta (Greaves's step/half-sister), Calabro, and a beeper once used by Joseph Monteleone, Jr., Monteleone's son. (T 2693, 4509; GX 333, 338, 406, 407, 408, 409).

Robert Ventriglia testified that he and Anthony Colandra shot Minerva and Imbergamo. (T 3186). On the night of the murders, Colombo family associate Eric Curcio, Monteleone's nephew, drove Ventriglia and Colandra to a location on Long Island, gave each of them a gun and directed them to shoot the men who entered a particular car parked

---

[3]     Citations to "T" refer to the transcript of trial in United States v. Gioeli and Saracino, No. 08-CR-204 (BMC) ("Gioeli").

outside of a strip mall. (T 3184). Although Ventriglia did not know where on Long Island this occurred, he described the route that they took, including his observation of a bar on his left as Curcio made a right onto a two-way road where the murder occurred (a right turn onto North Broadway from Boundary Avenue). Ventriglia also described cars parked parallel to the street and a mall that contained a row of stores, some of which were open and some of which were closed and had iron gates. (T 3183-84). Ventriglia also testified that he believed Curcio told him he was going to meet his uncle (Monteleone) at a bar. (T 3185). Following the murder, two men, one of whom was named "Dino" and whom Ventriglia identified from a photo array as Calabro, picked up Colandra and Ventriglia, took their guns and drove them back to Brooklyn. (T 3187-88).

Calabro testified that, on the evening of the murders, Colombo family associate Frank Sparaco picked him up in Brooklyn and drove him to North Broadway in Massapequa. (T 1026). When they arrived, they heard two younger men with guns shout the name, "Eric," and saw that two men were hunched over in a four-door Cadillac outside of Minerva's club. (T 1028-29). Calabro and Sparaco directed the two men to enter the car, took the guns, disassembled and discarded the guns and drove back to Brooklyn. (T 1028-30).

The following day, Gioeli met with Calabro in Brooklyn and the two recounted what had happened during the murder. (T 1030-31). Gioeli explained that he had been with Monteleone and Curcio at a strip mall on Boundary Avenue, but that he and Curcio had left to drive by Minerva's residence a few blocks away; when Gioeli and Curcio returned to the mall where they had left Monteleone, they saw police activity and left. (T 1031; GX 261, 267).

B.   Information Provided by Frank Sparaco

Colombo family associate Frank Sparaco has submitted an affidavit in support of Chucky Russo's motion in which Sparaco avers that Joseph Russo expressly told him to not include "Chucky" Russo in the plan to kill Minerva, that Chucky Russo believed he could resolve the war through talking rather than violence, and that Chucky Russo reprimanded him for participating in the Minerva murder.[4]

---

[4] Chucky Russo asserts that Sparaco said that he shared such information with prosecutors and agents during proffer sessions he participated in the course of his attempts at cooperation in or about 2010. (Letter of Alan S. Futerfas, Esq., to Hon. Brian M. Cogan, dated Aug. 20, 2014, at 1-2, appended to Russo's Rule 60(b) Mot.). It is true that Sparaco claimed that Chucky Russo was not involved in the Minerva and Imbergamo murders during some of those proffers, but in support Sparaco only said that Chucky Russo was not present at the meeting(s) that Sparaco attended regarding the murder of Minerva. To the government's knowledge, at no time did Sparaco ever claim that Joseph Russo told him to not include Chucky Russo or that Chucky Russo reprimanded Sparaco for participating in the double murder.

9

C.   Consensual Recording of Richard Fusco

On December 17, 2010, a cooperating witness made a consensual recording of Anthony "Big Anthony" Russo, no relation to petitioner Chucky Russo, who was then a Colombo family captain. During that conversation, Anthony Russo commented that Richie Fusco has told him:

> He goes, "Look at Chucky Russo and JoJo." [U/I] JoJo was acting boss [U/I] during the whole [U/I]. He goes, "Joe Monte and them clipped a man on Long Island. Chucky had nothing to do with it, knew nothing about it. JoJo gave the order. And Chucky Russo [U/I] had nothing to do; didn't even know that his cousin; he didn't know who they were gonna. They didn't tell him. They did it. Came back, next day he found out. He got life 'cause they say he gave the order. He didn't. He's doing life for no reason. Wasn't there. Never mind he wasn't there, he didn't even know about it.

Notably at the time Anthony Russo made these statements, Joseph Russo had died. According to the Bureau of Prisons, Joseph Russo died on July 29, 2007.

## DISCUSSION

I.   Presumptive Relation

Local Rule 50.3.2(b)(1) provides for a "presumption that one case is 'related' to another when the facts of each arise out of the same charged criminal scheme(s), transaction(s), or event(s), even if different defendants are involved in each case." Local Rule 50.3.2(c)(1) directs the United States Attorney's Office to "give notice to all relevant judges whenever it appears that one case may be presumptively related to another pursuant to Section (b)(1)." This case is presumptively related to <u>Gioeli</u>, <u>United States v. Robert Ventriglia</u>, No. 10-CR-403 (BMC), and <u>United States v. Anthony Colandra</u>, No. 10-CR-1008 (BMC), because certain of the facts of Chucky Russo's case arise out of the same criminal events as charged in <u>Gioeli</u>, <u>Ventriglia</u> and <u>Colandra</u>. Specifically, both Gioeli and Chucky Russo were charged with racketeering conspiracy, including the murders of John Minerva and Michael Imbergamo as predicate racketeering acts; and both Ventriglia and Chucky Russo were charged with the murders of John Minerva and Michael Imbergamo in aid of racketeering. Anthony Colandra was charged with falsely denying his participation in the murders of Minerva and Imbergamo. As the case is thus presumptively related to <u>Gioeli</u>, <u>Ventriglia</u> and <u>Colandra</u>, the government respectfully submits that reassignment of this case to Judge Cogan would be appropriate, as it would likely result in a significant savings of judicial resources and serve the interests of justice.

II.     The Petition Is a Successive Habeas Petition

Chucky Russo moves pursuant to Federal Rule of Civil Procedure 60(b) on the ground that he is factually innocent of the murders of John Minerva and Michael Imbergamo. Rule 60(b), however, is not available to Chucky Russo because his motion is, in fact, a second or successive habeas petition and thus requires permission from the court of appeals.

"Rule 60(b) allows a party to seek relief from a final judgment, and request reopening of his case, under a limited set of circumstances including fraud, mistake, and newly discovered evidence." Gonzalez v. Crosby, 545 U.S. 524, 528 (2005). However, when claims in a Rule 60(b) motion attack the integrity of the underlying conviction, as opposed to the previous habeas proceeding, it is the equivalent of a successive habeas petition.[5] Id. at 530. Use of Rule 60(b) in those circumstances, the Court stated, would "impermissibly circumvent the requirement" that successive petitions be certified by the court of appeals. Id. at 532.

Accordingly, the Court must deny Chucky Russo's claims as "beyond the scope of Rule 60(b)," Gitten v. United States, 311 F.3d 529, 534 (2d Cir. 2002), or consider converting those grounds to a successive petition to be transferred to the court of appeals for certification. Harris v. United States, 367 F.3d 74, 82 (2d Cir. 2004). If the court chooses to do the latter, it must provide notice to Chucky Russo and give him the opportunity to avoid transfer by withdrawing his motion or to frame his arguments in such a way as to meet the strict gatekeeping requirements for successive petitions. See id. at 82.

III.    Petitioner Cannot Sustain an Actual Innocence Claim

Even if Chucky Russo were entitled to a decision on the merits of his claim, his motion still fails because he cannot establish that he is actually innocent of participating in the murders of John Minerva and Michael Imbergamo.

A.      Applicable Law

As an initial matter, it appears that Chucky Russo is asserting a freestanding actual innocence claim, but it bears noting that the Supreme Court has never held that such a claim is cognizable. See House v. Bell, 547 U.S. 518, 554-55 (2006). As the Second Circuit explained in Friedman v. Rehal, 618 F.3d 142 (2d Cir. 2010):

> The Supreme Court has not finally resolved the issue of whether
> there is a federal Constitutional right to be released upon proof
> of actual innocence. As Chief Justice Roberts recently

---

[5] The government acknowledges that the Gonzalez court expressly limited its ruling to 2254 – not 2255 – petitions. Id. at 529 n.3. However, the reasoning employed in Gonzalez applies with equal force as to 2255 motions.

11

observed, "Whether such a federal right exists is an open question. We have struggled with it over the years, in some cases assuming, <u>arguendo</u>, that it exists while also noting the difficult questions such a right would pose and the high standard any claimant would have to meet." <u>District Attorney's Office v. Osborne</u>, --- U.S. ----, 129 S. Ct. 2308, 2321 . . . (2009) (citations omitted).

B. <u>Chucky Russo Has Not Established Actual Innocence</u>

Assuming <u>arguendo</u> that petitioner could assert such a claim for habeas relief, he must meet an "extraordinarily high" burden to justify such relief. <u>Id.</u> Petitioner cannot meet this high standard. He points to no reliable, newly discovered evidence that tends convincingly to show he is actually innocent. See <u>Schulp v. Delo</u>, 513 U.S. 298, 326-27 (1995). Accordingly, his motion should be denied in all respects.

Chucky Russo asserts three grounds in support of his actual innocence claim: an affidavit sworn by Frank Sparaco, a consensual recording of Anthony Russo, and the testimony of Dino Calabro in the <u>Gioeli</u> trial. None of these grounds, either individually or collectively, is sufficient for Chucky Russo to sustain his high burden in showing that he is actually innocent of the claim.

1. <u>Frank Sparaco's Affidavit</u>

As detailed below, Sparaco has provided many iterations of his knowledge of and participation in the murders of Minerva and Imbergamo, but in none of those accounts did Sparaco claim that Joseph Russo told Sparaco to keep the plan to murder Minerva from Chucky Russo or that Chucky Russo had reprimanded Sparaco for his participation in the murders. Furthermore, Sparaco has previously committed an elaborate fraud. Therefore, the affidavit submitted by Frank Sparaco is absurd and the Court should not place any weight on Sparaco's latest version that purportedly "exonerates" Chucky Russo.

a. <u>Sparaco's Accounts of the Minerva/Imbergamo Murders</u>

Sparaco has literally spent more than two decades fabricating events to law enforcement and others. With respect to the Minerva and Imbergamo murders alone, Sparaco has provided various versions of those murders, despite that he now admits to being present for the murder, an account the government credits. A summary of Sparaco's reporting on the Minerva and Imbergamo murders is set forth below.

- On day after the murders, on March 26, 1992, Sparaco reported that John Minerva and Michael Imbergamo had been murdered on the evening of March 25, 1992. Sparaco did not implicate himself in the murder. A copy of that report is attached as Exhibit 1.

12

- Two days after the murder, on March 27, 1992, Sparaco reported that "Tommy Gioeli, Joe Monte [Joseph Monteleone, Sr.] and two other individuals were the shooters." Sparaco explained that Gioeli and Monteleone had been watching the coffee shop that Minerva had opened and were just waiting for an opportunity to "hit" Minerva. Sparaco did not implicate himself in the murder. A copy of that report is attached as Exhibit 2.

- On January 18, 1995, Sparaco provided the following account. "Robert" and an unknown Puerto Rican male shot Minerva and Imbergamo; Curcio, Monteleone and Gioeli were "on the street." Sparaco and Dino Calabro, who were waiting in a car near the location where Minerva and Imbergamo were shot, picked up the two shooters. The Puerto Rican male got into an argument with drug dealers and fled to Puerto Rico. Sparaco did not exonerate Chucky Russo in this account, despite that Chucky Russo had been convicted at trial by the time that Sparaco provided this account. A copy of that report is attached as Exhibit 3.

- On January 26, 1995, Sparaco reported that Joseph Russo "had a large role in the Colombo LCN family war which included giving the orders to murder John Minerva [and] Michael Imbergamo . . . ." Sparaco did not exonerate Chucky Russo in this account, despite that Chucky Russo had been convicted at trial by the time that Sparaco provided this account. A copy of that report is attached as Exhibit 4.

- On or about April 29, 2008, Sparaco wrote a handwritten letter that included the following account. The murder "was planned by Tommy [Gioeli] and JoJo [Joseph] Russo" Sparaco explained that the Dino Calabro and Eric Curcio were supposed to be the shooters, but Curcio then recruited two others to do the shooting. Sparaco and Calabro picked up the two shooters and then drove them to downtown Brooklyn. Gioeli and Monteleone wanted to conceal from Joseph Russo that the shooters participated, but Sparaco refused to go along with that plan so Gioeli and Monteleone told Joseph Russo the "real story." Sparaco did not exonerate Chucky Russo in this account, despite that Chucky Russo had been convicted at trial by the time that Sparaco provided this account. A copy of that report is attached as Exhibit 5.

- Between January 29, 2010 and March 1, 2011, Sparaco participated in numerous proffer sessions with the government, during which he again discussed his knowledge of and participation in the Minerva and Imbergamo murders. Significantly, at no time during Sparaco's attempts to cooperate did Sparaco ever tell the government that Joseph Russo told him to keep the plan to murder Minerva from Chucky Russo or that Chucky Russo reprimanded Sparaco for participating in a murder. Rather, Sparaco only said that Chucky Russo did not attend the meeting(s) to plan the Minerva murder and that therefore he assumed Chucky Russo was not a participant. That alone, however, is not sufficient to exonerate Chucky Russo as there well could have been - and evidence bears out that there were - other meetings that Sparaco did not attend,

and Sparaco could not therefore say whether Chucky Russo attended and participated in those other meetings. A copy of that report is attached as Exhibit 6.

- During the Gioeli trial, in 2012, Sparaco penned two handwritten letters purportedly from Gioeli's co-defendant's attorney, Sam Braverman, and Gioeli himself, in which he attempted to exculpate Gioeli in a manner that can only be characterized as utterly bizarre and nonsensical. Copies of those two letters – and the relevant trial transcript excerpts explaining them – are attached as Exhibit 7.

b.   Prior Fraud by Sparaco

Moreover, Sparaco's information should be similarly distrusted in light of his history of orchestrating elaborate frauds. For example, for several years including 2009 and 2010, Sparaco purported to be an inmate with connections to Russian organized crime who had information about prisoners of war. Specifically, Sparaco represented to John Doe #1, whose identity is known to the undersigned, that two individuals, "Batts" and "Vyacheslav Ivankov," would be able to assist John Doe #1 in an investigation to locate prisoners of war (the "POW Investigation"). Sparaco then mailed handwritten letters purportedly from "Batts" and "Vyacheslav Ivankov" to an intermediary, who upon Sparaco's instructions, typed the letters, corrected any misspellings, and placed them in the mail. John Doe #1 then provided money to Sparaco and the intermediary in exchange for assistance with the POW Investigation. In fact, Sparaco never intended to – nor could he – provide any actual assistance to John Doe #1 with respect to the POW Investigation.

\* \* \*

Even if the statements in Sparaco's affidavit could be believed in part (which they cannot), they would not come close to meeting the high burden of establishing post-conviction innocence. Significantly, Joseph Russo and Chucky Russo could have made their purported self-serving statements simply to insulate Chucky Russo from criminal prosecution, a tactic that is used from time to time in La Cosa Nostra so that certain family members remain at liberty and the strength of crime family persists.

2.   Consensual Recording of Anthony Russo

Nor can the Court place much weight on the recording made on December 17, 2010 by a cooperating witness, on which recording Anthony Russo recounts a comment made by Richard Fusco, who is now deceased. As an initial matter, notwithstanding Chucky Russo's claims, it is not at all clear how Fusco would have even been in a position to know definitively whether Chucky Russo participated in the murders. To the government's knowledge, no one ever has suggested that Fusco was present for or participated in the murders. As such, the recording contains an unknown number of levels of hearsay. Fusco's statements to Anthony Russo, recounted to a cooperating witness, also lack indicia of reliability. First, contrary to Chucky Russo's suggestion, they are not admissible coconspirator statements, as they are offered by the defendant (and not against the defendant, as required under Federal Rule of Evidence 801(d)(2)(E)). Nor are they inherently reliable

14

given that Fusco has an interest in spreading the word that Chucky Russo is innocent and should be released from jail (and thus, can rejoin forces with the Colombo Family).  Finally, it is of no moment that Fusco singled out Chucky Russo.  Significantly, when Anthony Russo made the recorded statements, Joseph Russo had died and therefore there was no need to exonerate him.  It is also no surprise that he would not try to exonerate Monteleone since he was the one individual witnesses identified as being present near the murder scene and therefore could not possibly make an innocence claim.

### 3. Information Supplied by Dino Calabro

Nor does the testimony of Dino Calabro in the Gioeli trial support Chucky Russo's innocence.  Although Calabro did not mention Chucky Russo's participation in the murders during Gioeli trial, Calabro has advised the government that within a few days of the murder, Gioeli and Calabro met Joseph Monteleone and Chucky Russo at a diner at which Chucky Russo acknowledged Calabro's participation in the murders.  Notably, at no time did Chucky Russo admonish Calabro for participating in the Minerva and Imbergamo murders.  Calabro's information is thus not inconsistent with Chucky Russo's involvement in those murders.

## CONCLUSION

For the reasons set forth above, the case should be transferred to the Honorable Brian M. Cogan.  In addition, the Court should rule that Chucky Russo's motion is a successive habeas petition and transfer it to the Court of Appeals for the Second Circuit after providing notice to Chucky Russo and affording him an opportunity to withdraw or amend his successive habeas petition.  Alternatively, the Court should deny Chucky Russo's petition on the merits because he cannot sustain his high burden in establishing actual innocence.

The government further respectfully requests that this letter be filed under seal.  Public filing of this letter would reveal the nature and extent of Sparaco's efforts at cooperation as well as those of others.  See United States v. Doe, 63 F.3d 121, 128 (2d Cir. 1995) (danger to person may be compelling reason to override public's right of access in courtroom closure context).  Moreover, unsealing this letter, and thus revealing the details of the defendant's and others' cooperation, will likely harm the ability of law enforcement to secure current and future cooperation from persons similarly situated to the defendant, a fact that also weighs against public disclosure.  See United States v. Amodeo, 71 F.3d 1044, 1050 (2d Cir. 1995).  Under these circumstances, the parties' countervailing interests in protecting the safety of Sparaco and other witnesses outweigh the public's qualified right to access.  As the facts set forth above provide ample support for the "specific, on the record findings"

necessary to support sealing, Lugosch v. Pyramid Co., 435 F. 3d 110, 120 (2d Cir. 2006), the government respectfully requests that the Court record those findings and file this letter under seal.

                              Respectfully submitted,

                              KELLY T. CURRIE  
                              Acting United States Attorney

By:   /s/_____  
                              Elizabeth Geddes  
                              Assistant U.S. Attorney  
                              (718) 254-6430

cc:     Alan Futerfas, Esq. (by ECF)